**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **RODNEY L. STAMBACK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 7:16cv214** |
| | ) | |
| **NANCY A. BERRYHILL[1],** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Rodney L. Stamback ("Stamback") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433.  Stamback alleges that the Administrative Law Judge ("ALJ") erred by failing to give proper weight to the opinions of Stamback's treating physicians, the independent medical expert, and the state agency doctors. Stamback also alleges the ALJ should have given more weight to Stamback's subsequent supplemental security income ("SSI") approval. Finally, Stamback alleges that the ALJ erred by failing to properly consider his mental impairments under SSR96-8P, evaluate his credibility, and perform a function-by-function analysis.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND DENYING** Stamback's Motion for Summary Judgment (Dkt. No. 14) and **GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. No. 17).

---

[1] Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Stamback failed to demonstrate that he was disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Stamback filed for DIB on June 4, 2009, claiming that his disability began on April 15, 2003, due to back, right shoulder and knee problems, migraines, bipolar disorder, depression, anxiety attacks, multiple heart attacks, stents, chest pain, and shortness of breath. R. 76, 163. Stamback's date last insured was December 31, 2008; thus, he must show that his disability began on or before this date and existed for twelve continuous months to receive DIB.[3] R. 238; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Stamback's applications at the initial and reconsideration levels of administrative review. R. 76–86, 88–94.  On June 21, 2011, ALJ Thomas W. Erwin held a hearing to consider Stamback's claims for DIB ("2011 hearing"). R. 34–67. On July 14, 2011, the ALJ denied

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work.  Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience.  See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] Stamback was born on August 19, 1956, and was 59 years old on the date of the September 16, 2015 hearing, making him a person of  "advanced age" under the Act. R. 2075.

Stamback's claim for benefits ("2011 opinion"), finding that he was capable of performing a limited range of light work. R. 19–27. Stamback appealed the ALJ's decision and the Appeals Council denied his request for review on January 11, 2013. R. 1–4. However, on May 29, 2014, the Commissioner filed a motion for remand, which the court granted. Stamback v. Astrue, No. 7:13cv82 (W.D. Va. May 29, 2014); R. 2047. Additionally, Stamback filed an application for SSI benefits on July 25, 2011, and received a favorable determination on October 26, 2011, with disability beginning on July 25, 2011.  R. 2050, 2073.

On October 7, 2014, the Appeals Council entered an order remanding the case to the ALJ, and instructing the ALJ to consider the medical opinion of Alan McLuckie, M.D., including explaining the weight given to Dr. McLuckie's opinion, to consider Stamback's maximum residual functional capacity, and obtain supplemental evidence from a vocational expert to clarify the effect of the Stamback's limitations on his occupational base. R. 2050–52.

In compliance with the Appeals Council's order, the ALJ held hearings on March 11, 2015 and September 16, 2015 to consider Stamback's claim. R. 1986–2023, 2024–46. Counsel again represented Stamback at the hearing, which included testimony from vocational expert Asheley Wells.[4] On October 19, 2015, the ALJ entered his decision analyzing Stamback's claims under the familiar five-step process[5] and denying his claim for benefits. R. 1963–78. The ALJ

---

[4] Vocational Expert Michael Gore testified at the 2011 hearing. R. 34.

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability.  At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies.  42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

found that Stamback was insured at the time of the alleged disability onset and that he suffered from the severe impairments of status post right shoulder injury in 2003, migraines, hyperlipidemia, hypertension, a history of coronary disease, and anxiety disorder.[6] R. 1966. The ALJ determined that these impairments, either individually or in combination did not meet or medically equal a listed impairment. R. 1966–68. The ALJ concluded that Stamback retained the residual functional capacity ("RFC") to perform a limited range of light work. R. 1968. Specifically, the ALJ found that Stamback can only occasionally operate foot controls, reach overhead with the right upper extremity, kneel, crawl, crouch, stoop, balance, and climb ramps or stairs. R. 1968. Further, he can have only occasional exposure to excessive noise, vibration, pulmonary irritants, and extreme temperatures, and must never be exposed to hazards or climb ladders, ropes, or scaffolds. Finally, Stamback is limited to simple, routine, unskilled tasks, and must be allowed a break from work every two hours. R. 1968.

The ALJ determined that Stamback was unable to perform his past relevant work as a machine operator, but that he could perform jobs that exist in significant numbers in the national economy, such as assembler, packing line worker, and garment folder. R. 1976–77. Thus, the ALJ concluded that Stamback was not disabled. R. 1977. Stamback appealed the ALJ's decision and the Appeals Council denied his request for review on March 29, 2016. R. 1951–54.

## ANALYSIS

Stamback alleges that the ALJ failed to give proper weight to the opinions of: (1) Stamback's treating physicians, Alan McLuckie, M.D. and Mark Watts, M.D.; (2) independent medical expert Leonard Rubin, M.D.; and (3) the state agency doctors. Stamback further alleges that the ALJ should have given greater weight to: (4) Stamback's subsequent SSI approval. Finally, Stamback alleges that the ALJ erred by failing to properly: (5) consider his mental

---

[6] In the 2011 opinion, the ALJ found Stamback's anxiety disorder a non-severe impairment. R. 21–22.

4

impairments under SSR96-8P; (6) evaluate his credibility, including his complaints of migraines; and (7) perform a function-by-function analysis.

### A.  Medical History

1.  <u>Shoulder</u>

Stamback injured his right shoulder on April 30, 2003, while trying to pick up a 132 pound water pump. R. 586. He reported significant pain and was assessed with a shoulder strain. <u>Id.</u> On June 13, 2003, a right shoulder arthrogram showed no fracture or dislocation, nor any evidence of a tear. R. 356. In July 2003, Stamback presented to David J. Novak, M.D., complaining of decreased range of motion in his shoulder. R. 289. Dr. Novak noted that conservative measures had not provided effective pain relief, and recommended an arthroscopy. <u>Id.</u> Dr. Novak performed arthroscopic surgery on October 22, 2003 for repair of the subscapularis tendon and debridement of a partial thickness tear of the articular side of the rotator cuff. R. 282.

In January 2004, during a follow-up visit related to his shoulder surgery, Dr. Novak indicated Stamback's passive range of motion was "good" and that it was "too early for [him] to get discouraged." R. 266. Dr. Novak also noted that Stamback had missed "7 out of 16 scheduled [physical therapy] sessions for one reason or another." R. 266. Stamback returned to Dr. Novak in February 2004, complaining of constant pain over his trapezius and numbness "from shoulder to wrist." R. 264.   Dr. Novak indicated that he could not relate Stamback's trapezius pain to his shoulder "per se" and that Stamback failed to react to palpation over his trapezius when he was distracted. R. 264. Dr. Novak recommended conservative treatment, including injections, going forward. R. 264.

5

Stamback saw Kam F. Pang, M.D. in March 2004 complaining of chronic neck, shoulder, and right arm pain. R. 267. He reported numbness from the shoulder to the hand, and stated he could not raise his arm above his shoulder. On examination, Dr. Pang found no abnormal muscle tone, joint swelling, tremors or neurological deficits. R. 267–68.

Stamback underwent multiple physical therapy evaluations in 2004. R. 432, 436, 388–408, 719–21, 767–78, 807. In November 2004, Rebecca Tanner, M.D. evaluated him and provided an impairment rating, with an upper extremity impairment of 8% and a whole person impairment of 5%. R. 720–21. She restricted him to light duty work with no lifting above the shoulder on the right side. Id. Dr. Tanner also indicated that Stamback has "tightness and intermittent spasm that persists in the right shoulder girdle" and has "plateaued on all therapies." R. 720. In September 2005, Dr. Tanner noted that Stamback's shoulder impairment was not helped by the injections. R. 735. Dr. Tanner performed a nerve conduction study on January 3, 2005, which was within normal limits. R. 756.

2.  Migraines

In September and October 2003, Stamback presented to Dr. Watts, complaining of high blood pressure and migraines, and indicating that he had visited the emergency room five times for these complaints. R. 1295–1302. Between December 2003 and March 2006, he presented to the emergency department on 14 occasions complaining of migraines.[7] R. 470–530. In March 2004, he stated while in the emergency department that he "has a migraine every month."[8] R. 573. Dr. Tanner treated Stamback for headaches, neck, and shoulder pain, administering

_____

[7] Stamback presented to the emergency department complaining of migraines in December 2003, January 2004, February 2004, March 2004, May 2004, July 2004, twice in August 2004, November 2004, March 2005, April 2005,  March  2006  R. 470, 475, 479, 483, 487, 492, 499, 507, 512, 521, 526, 530

[8] An x-ray and MRI of the cervical spine in July 2004 showed mild degenerative changes, with no evidence of cord compression or neural compression. R. 354, 458.

injections, from April 2004 to October 2006. R. 735. Dr. Tanner indicated in September 2005

that his migraines and neck pain have done "tremendously well after cervical epidural steroid

injections . . . ." R. 735.

3.  Heart

In September 2003, Stamback presented to Frank England, M.D., as a follow up from his

recent heart operations, and to be cleared for his shoulder surgery. R. 444. Dr. England noted that

Stamback had stents placed in December 2002, and that he was doing relatively well, with some

limitations in his daily activities, but that he could be cleared for surgery from a cardiac

standpoint. Id.

In September 2004, Stamback had an echocardiogram which showed moderate to

severely decreased left ventricular function, left ventricular enlargement, and multiple segmental

wall motion abnormalities. R. 439. In February 2008, Stamback underwent a repeat cardiac

catheterization, which reduced his significant stenosis. R. 1027, 1096.[9] In September 2008,

during a cardiac follow up appointment, Dr. England assessed him with dyspnea during exertion,

coronary artery disease, a history of stent placement, and ongoing management of coronary

artery disease and hyperlipidemia. R. 1542. However, Dr. England noted that, "from a cardiac

standpoint, [Stamback] was stable." Id.

4.  Mental Impairments

On January 5, 2010, Stamback was admitted to the hospital with suicidal ideation

accompanied by plans, brought on by increased stress related to his physical health,

unemployment, and family issues. R. 1386. He was discharged on January 8, 2010. R. 1387.

Following his discharge, Stamback was treated at Blue Ridge Behavioral Healthcare between

---

[9] Prior to surgery, Stamback severe single-vessel coronary artery disease with 95% stenosis in his mid left anterior descending artery. R. 1096.

May 2010 and January 2011, and diagnosed with major depression and a history of alcohol dependence. R. 1557–88.

     5.  <u>Medical Opinion Evidence</u>

In November 2009, Richard Surrusco, M.D., a state agency doctor, reviewed the record and found that Stamback was capable of a range of light work. R. 1356–60. In April 2010, Michael Hartman, M.D. another state agency doctor agreed that Stamback could perform a limited range of light work, but included a limitation in reaching. R. 1437–40.

In November 2009 and April 2010, respectively, state agency psychologists Richard Milan, Jr., Ph.D. and Julie Jennings, M.D., performed a records review and both found a non-severe mental impairment with mild restrictions in activities of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation of extended duration.[10] R. 1363–75, 1409–34.

In May 2011, Stamback's primary care provider Dr. Watts completed a Medical Source Statement (Physical), indicating that Stamback could stand and/or walk less than two hours per day, but had no limitations on sitting. He further indicated that Stamback could reach only occasionally and could never climb ramps, stairs, ladders, ropes, scaffords, or balance, kneel, crouch, crawl, or stoop. R. 1611–14. Dr. Watts also found that Stamback would likely be absent from work more than three times a month due to his impairments. R. 1614.

Dr. McLuckie completed a Cardiac Residual Functional Capacity Questionnaire, also in May 2011.  R. 1617–23. He found that Stamback "could possibly work a [low stress] sedentary

---

[10] The state agency psychologists found that Stamback had a non-severe generalized anxiety disorder. R. 1419, 1368.

job"[11] and estimated that he would be absent from work as a result of his impairments "about twice a month." R. 1618, 1623. Dr. McLuckie further found that Stamback could sit continuously for 15 minutes before needing to stand or walk for 15 minutes. R. 1618.

In October 2011, Natalie Leonard, RN, wrote a letter indicating that it is difficult for Stamback to interact with others due to anger outbursts, and that his injuries "along with his cardiac condition coupled by his mental illness make it very difficult for [him] to be employed." R. 2222.

In March 2015, the ALJ requested a records review from independent medical expert Leonard M. Rubin. Dr. Rubin issued an opinion having reviewed Stamback's medical record. Dr. Rubin found that Stamback could perform a limited range of light work, with occasional postural activities and occasional reaching of the right hand.[12] R. 2229–34.

### B. Treating Physicians' Opinions

Stamback argues that the ALJ erred by failing to give greater weight to the opinions of treating physicians Drs. McLuckie and Watts. Stamback asserts that there is "overwhelming" evidence in the record to support these doctors' opinions, and that the ALJ erred by rejecting their opinions and relying instead on the opinions of the state agency physicians. Pl.'s Br. at 32, Dkt. No. 15.

The social security regulations require that an ALJ give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in

---

[11] As noted by the ALJ, if Stamback were limited to sedentary work, the medical vocational rules would direct a finding of disabled. R. 2044.

[12] As discussed below, Dr. Rubin initially found in his written narrative that Stamback could stand and walk six hours, but found in his Medical Source Statement form that he could stand and walk only four hours. R. 2227, 2230. However, in response to the ALJ's interrogatory request, Dr. Rubin clarified that Stamback could stand and walk six hours in an eight hour day. R. 2236–37.

[the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Saul v. Astrue, No. 2:09–cv–1008, 2011 WL 1229781, at *2 (S.D.W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, No. 2:09cv622, 2010 WL 6621693, at *10 (E.D.Va. Dec. 29, 2010).

Here, the ALJ appropriately considered these factors and the record, in determining the weight to give to the opinions of Drs. McLuckie and Watts. The ALJ gave Dr. McLuckie's opinion little weight, noting that Dr. McLuckie's medical source statement was completed "long after his treating relationship with [Stamback] ended[13] and the "opinion relies on the cardiac evidence after the date last insured, and is internally inconsistent [regarding how long Stamback can stand and walk]."[14] R. 1964, 1973. The ALJ emphasized that Stamback did not begin having significant cardiac symptoms which did not respond well to treatment, until May 2010, well after the alleged onset date and date last insured. R. 1973. The ALJ also noted that Stamback

---

[13] Stamback contests this finding, pointing out that he was "seen at Dr. McLuckie's office in December 2010 and the RFC form was completed in May 2011." Pl.'s Br. at 27, Dkt. No. 15. However, the Commissioner points out that Stamback was not seen by Dr. McLuckie in December, but rather Dr. MckLuckie's colleague. D's Br. at 20, Dkt. No. 18; R. 1520. Stamback was last seen by Dr. McLuckie in May 2010. R. 1529–31.

[14] The ALJ wrote that Dr. Mcluckie, "opined [Stamback] had to stand and walk for 15 minutes at a time, then indicates three hours of continuous standing, but later he limited him to standing and walking only one to two hours per day." R. 1973.

continued to work as a machinist, a medium exertional job, following his first cardiac treatment

in 2002, and did not stop working until April 2003, when he injured his shoulder. The ALJ

wrote, "This contradicts Dr. McLuckie's opinion that [Stamback] had such severe cardiac

limitations beginning in 2003." R. 1973.  In 2003, Stamback reported to his cardiologist, Dr.

England, that he was doing "relatively well" following stent placement in 2002, and Dr. England

cleared him for shoulder surgery. R. 444.

The ALJ likewise gave Dr. Watt's opinion little weight, explaining that it was a check

box form, was conclusory, and failed to cite any specific medical evidence or findings in support.

R. 1972–73. The ALJ also noted that Dr. Watt's opinion "was rendered almost 3 years after

[Stamback's] date last insured, there was "no evidence [he] treated [Stamback] at his alleged

onset date[15]" and the medical evidence of record showed Stamback "rarely complained of

cardiac symptoms from 2003 to February 2008, when his cardiac symptoms were successfully

treated by procedure." R. 1973. Indeed, in September 2008, Stamback's cardiologist noted that

he was stable "from a cardiac standpoint." R. 1542.

The ALJ considered the opinions of Drs. McLuckie and Watts, together with all of the

evidence in the record, and determined that Stamback was capable of a limited range of light

work. This is the ALJ's job: to review the medical evidence of record, weigh the medical

opinions, and determine an RFC that represents Stamback's functional capacity. Having

reviewed the record as a whole, I find that substantial evidence supports the ALJ's decision to

give the opinions of Drs. McLuckie and Watts little weight, and recommend that it be affirmed.

### C.  State Agency Doctors and Independent Medical Examiner

---

[15] Stamback points to medical records showing that Dr. Watts has been his primary care physician since at least 2001, "well before his alleged onset date." Pl.'s Br. at 28–29, Dkt. No. 15.

Stamback argues that the ALJ erred by giving significant weight to the opinions of the independent medical expert Dr. Rubin, and the state agency doctors. Stamback argues that when, in response to the ALJ's questions for clarification regarding the length of time Stamback could stand and walk, Dr. Rubin changed his opinion, which resulted in an unexplained ambiguity. Pl's. Br. at 35–36, Dkt. No. 15.

The ALJ adequately explained his decision to give the "most weight" to Dr. Rubin's clarification that Stamback was capable of standing or walking for six hours in an eight-hour day. R. 1974. The ALJ noted that Dr. Rubin's "initial opinion was ambiguous as to whether he believed [Stamback] could" perform six hours or only two to four hours of standing or walking in a workday. Id. Thus, the ALJ send additional interrogatories asking him for clarification. R. 2237. The ALJ writes that in Dr. Rubin's "second response . . . he clearly opined that [Stamback] could stand or walk for six hours in an eight-hour workday." Id. The ALJ's opinion is supported by the record.

Further, the ALJ adequately explained his decision to give significant weight to Dr. Rubin's opinion, writing that Dr. Rubin examined all the medical evidence of record, and his opinion was generally consistent with the medical evidence, including that the claimant received little treatment after his shoulder surgery, and had no "serious cardiac complaints" after his stent placement in 2002. R. 1974.

Stamback also argues that the ALJ should not have given greater weight to the opinions of the state agency physicians' than his treating physicians. As discussed above, the ALJ sufficiently articulated his decision to give "little weight" to the opinions of Drs. McLuckie and Watts. Further, the ALJ adequately explained his decision to give significant weight to the opinions of the state agency doctors, stating that the opinions were supported by the record,

including that Stamback "rarely complained of shoulder pain . . . after his successful . . . rotator

cuff [surgery]" and had "generally normal" physical examinations. R. 1972.

Accordingly, I find that substantial evidence supports the ALJ's decision to give

significant weight to the opinions of Dr. Rubin, and the state agency doctors, and recommend

that it be affirmed.

### D. Mental Impairments under SSR 96–8P

Stamback argues that the ALJ erred by failing to properly consider the severity of his

mental impairments under SSR 96-8P.[16]  See Titles II & Xvi: Assessing Residual Functional

Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996). Stamback also asserts that the ALJ

failed to address his moderate limitations in concentration, persistence, or pace in assessing his

RFC, and further failed to provide any hypothetical questions to the vocational expert that

addressed these limitations. The Commissioner counters that "the ALJ sufficiently articulated

why [Stamback's] moderate limitations in concentration, persistence, or pace did not translate

into a limitation in the RFC assessment beyond simple, routine, unskilled tasks, with breaks at

least every two hours." D's Br. at 29, Dkt. No. 18. The Commissioner argues that by limiting

Stamback to jobs that allow for breaks at least every two hours, the ALJ properly accounted for

his moderate limitations.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the

evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-

2767, 2011 U.S. Dist. LEXIS 153878, at *23, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011).

---

[16]  Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that
the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding
on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20
C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are
clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P at *7; Meadows v. Astrue, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9-cv-2545, 2010 U.S. Dist. LEXIS 132972, at *15-16, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

Here, the ALJ's discussion of Stamback's mental limitations satisfies the requirements of SSR 96-8P and the court is capable of meaningfully reviewing the RFC. The ALJ considered both medical and non-medical evidence in assessing Stamback's RFC and provided the narrative discussion required by the regulations. See Taylor v. Astrue, No. 11-cv-32, 2012 U.S. Dist. LEXIS 11307, at *17, 2012 WL 294532, at *6 (D. Md. Jan. 31, 2012) (noting that while SSR 96-8 requires an ALJ to consider the evidence presented on a function-by-function basis, it does not require the ALJ to produce such a detailed statement in writing, but rather is sufficient if it includes a narrative discussion of the claimant's symptoms and medical source opinions). The ALJ reviewed the history of Stamback's mental symptoms and his mental health treatment, including his hospitalization for suicidal ideation, his treatment at Blue Ridge Behavioral Healthcare, and the opinions of the state agency psychologists and Nurse Leonard. R. 1971, 1973. The ALJ wrote:

> The undersigned gives [Stamback's] testimony some benefit of the doubt and finds that
> [he] had moderate limitations in concentration, persistence or pace. . . .There is no

evidence suggesting marked limitations. [Stamback] had a normal mental status at his appointments. He did not usually complain of difficulties with concentration, persistence, and pace.

R. 1967.

In the RFC, the ALJ indicated that Stamback's "work must have allowed for breaks every two hours, and he is limited to simple, routine, unskilled tasks." R. 1968. The ALJ gave limited weight to the opinion of the state agency psychologists who found that Stamback's anxiety disorder was nonsevere and caused only mild difficulties in concentration, persistence, or pace. R. 1972. In support, the ALJ noted:

Even though [Stamback] rarely complained of active mental symptoms, he took two or three psychiatric medications to treat his anxiety and insomnia. The medical evidence suggests that his medications controlled his symptoms well, but is it is still possible that he had some, which could cause moderate limitations.

R. 1967, 1972. And further, the ALJ wrote that Stamback's mental health symptoms were "well controlled with medication" following his hospitalization in 2010, with Stamback reporting "improved relationships and stable mood." R. 1971. Regarding

Likewise, Stamback's arguments that the ALJ erred by failing to account for the moderate limitations in concentration, persistence, and pace he found at step two, and failing to provide any hypothetical questions to the vocational expert that addressed these limitations, are not well taken. In Mascio v. Colvin, the Fourth Circuit held that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" 780 F.3d 632, 638 (4th Cir. 2015) (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)).  The Fourth Circuit emphasized the distinction between the ability to perform simple tasks and the ability to stay on task, stating that "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." Id.  Although the Fourth Circuit noted that the ALJ's error

might have been cured by an explanation as to why the claimant's moderate difficulties in

concentration, persistence, or pace did not translate into a limitation in the claimant's RFC, it

held that without such an explanation, remand was necessary.[17] Id.

     This is not a situation like Mascio, where the ALJ summarily concluded that a limitation

to simple, unskilled work accounts for the claimant's moderate impairment in concentration,

persistence and pace without further analysis. Here, the ALJ specifically accounted for a

diminished ability to stay on task by providing for breaks every two hours, and explained why

Stamback's moderate limitations in concentration, persistence, and pace were accommodated by

a restriction to simple, unskilled work, with breaks every two hours. The ALJ wrote:

> As to [Stamback's] anxiety disorder, the medical evidence of record shows that he rarely
> complained of active mental symptoms related to his anxiety disorder. He took routine
> medication for it, but he never went to counseling. He never needed inpatient treatment
> before the date last insured. He never alleged any significant limitations in social
> functioning to treating practitioners. [Stamback] almost always had a normal mental
> status at his appointments, suggesting that his medications worked well. *Because there is
> little evidence of any mental deficits, the undersigned has given [Stamback] only two
> limitations to his mental RFC, which are the limitations to routine, unskilled tasks and
> the need for a normal work break every two hours.*

R. 1976 (emphasis added). Further, at the September 2015 hearing, the ALJ stated in his question

to the vocational expert:

> [The hypothetical individual] [w]ould be limited to simple, routine, unskilled tasks. I
> think any difficulties maintaining concentration could be accommodated at regular
> breaks, but would need a break sort of typically every two hours and a lunch break.

---

[17] Thus, Mascio does not broadly dictate that a claimant's moderate impairment in concentration,
persistence, or pace always translates into a limitation in the RFC. 780 F.3d 638. Rather, Mascio underscores the
ALJ's duty to adequately review the evidence and explain the decision, especially where, as the ALJ held in Mascio,
a claimant's concentration, persistence, or pace limitation does not affect the ability to perform simple, unskilled
work. The ALJ's responsibility to highlight the evidence of record that supports his conclusion was further
emphasized recently in Monroe, where the Court of Appeals found that the ALJ must provide a sound basis for his
ruling, including discussing what evidence he found credible and "specific application" of the law to the record. See
Monroe, 826 F.3d at 189 (emphasis added) (quoting Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013)).

R. 2042. Unlike the claimant in Mascio, the medical evidence here supports the ALJ's

conclusion that, despite his moderate limitation in concentration, persistence, or pace, Stamback

is capable of performing the basic mental demands of unskilled work with breaks every two

hours. The ALJ emphasized Stamback's generally normal mental status exams, few complaints

of active mental symptoms, and efficacy of his medications. R. 1976. Thus, this court is not "left

to guess about how the ALJ arrived at his conclusions." Mascio, 780 F.3d at 637; see also

Massey v. Colvin, No. 1:13-cv-965, 2015 U.S. Dist. LEXIS 79708, at *20, 2015 WL 3827574, at

*7 (M.D.N.C. June 19, 2015); Hutton v. Colvin, No. 2:14-cv-63, 2015 U.S. Dist. LEXIS 77846,

at *8, 2015 WL 3757204, at *3 (N.D. W. Va., June 16, 2015).

### E.  Subsequent SSI Approval

In October 2011, state agency doctor Bert Spetzler, M.D. reviewed the record related to

Stambacks's July 2011 SSI claim and determined that he was disabled as of July 25, 2011.

R. 286. Stamback argues that the ALJ "improperly concluded that the subsequent SSI

determination was based upon evidence generated after plaintiff's date last insured" and should

have given the determination greater weight. Pl.'s Br. at 41, Dkt. No. 15.

To be entitled to DIB, Stamback must prove disability prior to December 31, 2008; in

contrast, his SSI claim required proof of disability from August 1, 2011. Compare 20 C.F.R.

§§ 404.101(a), 404.131 with 20 C.F.R. §§ 416.202, 416.501. Here, the ALJ specifically

explained why he found that Dr. Spetzler's 2011 SSI opinion was based on medical evidence that

post-dated Stamback's date last insured of December 31, 2008, and thus was accorded little

weight. The ALJ noted that the "[Dr. Spetzler] limited [Stamback] to sedentary work as of July

2011, his filing date" based on cardiac treatment beginning in May 2010 showing an enlarged

heart, multiple stents placed in 2010, and an echocardiogram showing reduced ejection fraction

17

in June 2011. R. 1973–74. He wrote, "While such evidence supports the onset date in July 2011,

it is of little relevance to [Stamback's] functioning in 2008, his date last insured." R. 1974. The

ALJ emphasized that Stamback had a successful cardiac procedure in 2008, complained of "no

cardiac symptoms again until May 2010" and his cardiac condition "worsened significantly by

2010 or 2011." Indeed, Stamback's February 2008 repeat cardiac catheterization reduced his

stenois and, in September 2008, Dr. England noted that he was "stable" from a cardiac

standpoint. R. 1027, 1542.  Thus, the ALJ reasonably concluded that, while the medical evidence

supports Stamback's limitation to sedentary work in 2011, "it does not support such a limitation

before [his] date last insured." R. 1974. Accordingly, the ALJ's decision to accord the SSI

disability determination little weight is supported by substantial evidence.

## F. Credibility[18]

Stamback argues that the ALJ's credibility findings are not supported by substantial

evidence. In support, Stamback asserts that the ALJ wrongly concluded he used only

---

[18] I note that in March 2016, the Social Security Administration superseded the language of SSR 96-7P when it ruled in SSR 16-3P that "credibility" is not appropriate terminology to be used in determining benefits. See Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P (S.S.A. Mar. 16, 2016) (effective March 28, 2016). "[W]e are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. SSR 16-3 at *1. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character." Id. Thus, under SSR 16-3P, the ALJ is no longer tasked with making an overarching credibility determination and instead must assess whether the claimant's subjective symptom statements are consistent with the record as a whole.

Here, SSR 16-3P was issued after the ALJ's consideration of Stamback's claim, and both the ALJ's opinion and the parties' briefs speak in terms of a "credibility" evaluation. Accordingly, I will analyze the ALJ's decision based on the provisions of SSR 96-7p, which required assessment of the claimant's credibility." See Keefer v. Colvin, No. CV 1:15-4738-SVH, 2016 WL 5539516, at *11 (D.S.C. Sept. 30, 2016); ford v. Colvin, No. 2:15-CV-05088, 2016 WL 5171986, at *5 (S.D.W. Va. Sept. 21, 2016); Hose v. Colvin, No. 1:15CV00662, 2016 WL 1627632, at *5 (M.D.N.C. Apr. 22, 2016); Lopez v. Colvin, No. 3:16CV24 (JAG), 2016 WL 6594107, at *4 (E.D. Va. Oct. 13, 2016) (noting "[t]he Agency does not have the power to engage in retroactive rulemaking").

However, I note that the methodology required by both SSR 16-3P and SSR 96-7P, are quite similar. Under either, the ALJ is required to consider Stamback's report of his own symptoms against the backdrop of the entire case record; in SSR 16-3, this resulted in a "credibility" analysis, in SSR 16-3, this allows the adjudicator to evaluate "consistency."

Acetaminophen for pain relief in 2008[19] and failed to properly consider the "chronicity and severity" of his migraines and their impact on his ability to work. Pl.'s Br. at 43. Stamback also argues that the ALJ fails to recognize that he is "stubborn and does not want to accept his own . . . limitations," leading him to attempt activities beyond his physical capabilities.[20] Pl.'s Br. at 44–45, Dkt. No. 15.

It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work.  See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Stamback's subjective allegations of his disabling symptoms and impairments are not conclusive on their own; rather, subjective complaints and statements of symptoms, like all other evidence of disability, are considered in the context of the Record as a whole.  20 C.F.R. §§ 404.1529, 416.929 (2014). If a claimant's statements are inconsistent with other evidence, the ALJ may find them less than fully credible and weigh them accordingly. See SSR 96-4P, (July 2, 1996); SSR 96-7P (superseded by SSR 16-3P, (March 28, 2016)).

In this case, the ALJ found that Stamback's statements regarding the severity of his limitations were not entirely credible in light of his treatment history, the objective medical evidence, and his participation in certain highly physical activities. The ALJ's opinion includes a detailed consideration of Stamback's medical history along with Stamback's own allegations. After a review of Stamback's treatment records and allegations of disability, the ALJ stated:

> [I] find that [Stamback's] medically determinable impairments could reasonably be
> expected to cause the alleged symptoms; however, [Stamback's] statements concerning

---

[19] Stamback takes issue with the ALJ's statement that, "[n]otably [Stamback] was using only acetaminophen for pain relief as of December 31, 2008" arguing that, in fact, Stamback was "taking Acetaminophen-Caff-Butalbital."[19] Pl's Br. at 42, Dkt. No. 15; R. 1733. However, the ALJ's mere failure to include the complete drug name is not grounds for remand.

[20] As pointed out by the Commissioner, the ALJ's conclusion that Stamback's failure to immediately file another application for benefits after his initial application was denied is further evidence of disability was not dispositive, but was merely noted by the ALJ as additional support for the ALJ's decision.

the intensity, persistence and limiting effects of these symptoms are not entirely credible
for the reasons explained in this decision.

R. 1974. The ALJ outlined his reasons for this determination, including that treatment has been

generally successful in controlling Stamback's cardiac symptoms, the objective medical

evidence showed only mild abnormalities, specifically mostly normal musculoskeletal findings,

near normal range of motion in his shoulder and no complaints of tenderness to palpitation

following his shoulder surgery. R. 1975.  The ALJ also noted that that Stamback has not

"consistently complained of and sought treatment for symptoms related to his alleged

impairments" despite a "large worker's compensation settlement in 2006."[21] See Thompson v.

Colvin, No. 7:15-CV-00026-BO, 2016 WL 1069654, at *3 (E.D.N.C. Mar. 16, 2016) (upholding

the ALJ's credibility analysis which relied, in part, on the plaintiff's receipt of a $200,000

workers' compensation settlement and continued purchase of cigarettes to contradict plaintiff's

claim that he could not afford medication). The ALJ also referenced Stamback's reported

activities of using a chain saw, riding on a mule, and climbing a ladder, and emphasized that

Stamback's use of a 32-inch chainsaw, which the ALJ defined as a "large, heavy, dangerous

piece of equipment, usually used by professionals to cut large trees" indicates claimant's "ability

to use his arms is not as limited as he claims." [22] R. 1975.

At the hearing, Stamback testified that between 2003 and 2008 he was having migraines

between two and three times per month, and that the migraine would last four days. R. 2013. He

testified that when a migraine occurred he would "have to go to the hospital and get a shot." R.

---

[21] According to the Commissioner, Stamback received a worker's compensation settlement of $145,000.
D's Br. at 37 n. 15, Dkt. No. 18.

[22] An office note from Dr. Watts dated May 2010 indicates that Stamback presented with shoulder pain
after "falling off ladder headfirst," however, an x-ray showed no fracture or misalignment. R. 1480, 1489. An office
note from Douglas U. Kells, M.D. indicates that Stamback complains of shoulder pain after he fell off a mule.
R. 1500.

2013. Indeed, the medical record shows that he presented to the emergency room seeking treatment for headaches on multiple occasions.[23] Regarding these migraines, the ALJ discussed Dr. Tanner's note from an office visit in August 2005, indicating that Stamback's migraines have done "tremendously well" following two cervical epidural steroid injections. R. 735, 1970. The ALJ also indicated that, Stamback "reported to other doctors that [the cervical steroid injections] relieved his pain."

A reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions.  See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). Further, a reviewing court will defer to the ALJ's credibility finding except in those "exceptional" cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.  See Bishop v. Comm'r of Soc. Sec., 583 F. App'x 65, 68 (4th Cir. 2014) (citing Edeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997)).

The ALJ acknowledged during the 2015 hearing that this was a "very close case" (R. 2045), however, his opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence or disturb his credibility finding. Therefore, I find that substantial evidence exists to support the ALJ's determination that Stamback's testimony is only partially credible, and that Stamback is capable of performing work at the level stated in the ALJ's opinion.

---

[23] As indicated previously, between December 2003 and March 2006, Stamback presented to the emergency department on 14 occasions complaining of migraines. R. 470–530.

### G.  Function by Function Analysis

Stamback argues that the ALJ erred by failing to perform a function-by-function analysis of his impairments. Stamback asserts that the ALJ failed to "make any specific findings regarding [Stamback's] inability to maintain a static work posture, his need to lie down and rest during the day, [and] the frequency he would be absent from work." Pl.'s Br. at 45–46, Dkt. No. 15. These arguments amount to disagreements with the ALJ's RFC determination and essentially ask the court to reweigh the evidence.

SSR 96-8p requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. 1996 WL 374184 (SSA) (July 2, 1996). Specifically, the ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). However, in Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.' " 780 F.3d at (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two

residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." <u>Newcomb v. Colvin</u>, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96-8p, and contains sufficient information to allow meaningful review. Unlike the ALJ in <u>Mascio</u>, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a detailed summary of Stamback's medical records, the medical opinions, Stamback's hearing testimony and the ALJ's conclusions. R. 1969–77. The ALJ considered the conflicting medical opinions in the record and explained the weight given to each opinion. Further, the RFC delineates Stamback's exertional limitations, including amounts of weight Stamback can lift and/or carry, amounts of time that he can perform activities such as standing, walking, and reaching, hazards he must avoid, and required breaks. R. 1968.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record.  Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof.  Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected

to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including the waiver of the right to appeal.

Entered:  June 14, 2017

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge